## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MARC C. BARBE and** | * | |
| **RENADA E. BARBE,** | * | **C.A. NO.: 2:18-cv-14037** |
| | * | |
| **Plaintiffs,** | * | **JUDGE MARTIN L. C. FELDMAN** |
| | * | |
| **VERSUS** | * | **MAG. JUDGE MICHAEL NORTH** |
| **OCWEN LOAN SERVICING, LLC and** | * | |
| **AMERICAN MODERN HOME** | * | |
| **INSURANCE COMPANY** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

**************************************

### MEMORANDUM IN OPPOSITION TO
### OCWEN LOAN SERVICING, LLC'S 12(b)(6) MOTION TO DISMISS

**NOW INTO COURT,** through undersigned counsel, come plaintiffs, Marc C. Barbe and

Renada E. Barbe (hereinafter collectively referred to as "Plaintiffs" and/or the "Barbes") and file

their Memorandum in Opposition to the 12(b)(6) Motion to Dismiss of defendant, Ocwen Loan

Servicing, LLC (hereinafter referred to as "Ocwen").

### I.        INTRODUCTION

The underlying Petition for Damages was filed in the 24th Judicial District Court of

Louisiana.  A First Supplemental and Amended Petition was filed with leave of Court on

February 19, 2019.[1]  As it relates to Ocwen, the Barbes have demonstrated that: (1) the filed rate

doctrine is inapplicable under the facts of this case; (2) Ocwen breached the underlying mortgage

agreement, both by conspiring to and/or actually over-charging the Barbes for a force-placed

insurance policy and by failing to pursue adequate insurance proceeds against AMHIC in the

wake of the Barbes' claim; (3) the Barbes have standing to bring their claim against Ocwen for

---

[1] R. Doc. 22.

its breach of the duty of good faith and fair dealing; (4) Ocwen and AMHIC were engaged in a conspiracy to defraud the Barbes; and (5) the Barbes delictual actions were not prescribed, as the doctrine of *contra non valentem* acted to toll the running of prescription.  As such, Ocwen's Motion to Dismiss should be denied.

## II.  FACTS

The Barbes own the property located at 4421 Pike Drive, Metairie, Louisiana 70003 (hereinafter referred to as the "Property").[2]  At all times material hereto, the Barbes had a mortgage on the Property (hereinafter referred to as the "Mortgage"), which was serviced by Ocwen Loan Servicing, LLC (hereinafter referred to as "Ocwen").[3]  On or about August 5, 2016, high-velocity winds damaged the roof and exterior elevations of the Property, allowing water to infiltrate the interior and further damage the ceilings, walls, floors, and interior fixtures.[4]

### A.    *The American Modern Homes Insurance Company Policy*

In a letter dated December 31, 2015, Ocwen notified the Barbes that an AMHIC force-placed insurance policy, policy number OHZ0170786, would be renewed to cover the Property "for you."[5]

The Barbes are "insureds" under the Policy, according to the express language provided therein.  First, the Policy's Evidence of Insurance sheet lists "Marc Gerard Barbe" by name.[6]  Second, the Policy insures the Property to its value—not the value of Ocwen's interest—and thus insures the Barbes' equity interest in the Property.[7]

---

[2] R. Doc. 22, ¶ 5.
[3] R. Doc. 22, ¶ 6.
[4] R. Doc. 1-1, ¶ 9.
[5] Ocwen 12/31/2015 letter to the Barbes, with Evidence of Insurance sheet, attached R. Doc. 22 as Exhibit 1, p. 1 ("We have issued this policy *for you*…" which is a clear indication Ocwen procured the Policy for the Barbes' benefit, as well as that of Ocwen).
[6] R. Doc. 22, Exhibit 1, p. 5.
[7] Mortgage Agreement, R. Doc. 22, Exhibit 2, p. 1; R. Doc. 22, Exhibit 1, p. 5.

The Policy also contemplates direct payments to the mortgagors, *i.e.* the Barbes.  Paragraph G, the "Loss Payable" provision, states: "Loss, if any, shall be made payable to you *as your interests appear*."[8]  As such, AMHIC has a duty to pay Ocwen for any claim up to the value of its interest in the Property, but because the Policy is for a value greater than Ocwen's interest, any proceeds in excess of Ocwen's interest must be paid to the Barbes—the mortgagors/owners of the Property.[9]  The Policy also contemplates payment to the Barbes in Paragraph AA(2), which states: "If we pay you for any loss *and do not pay the mortgagor*…"[10]  Additionally, the Barbes own the Property and are under an obligation to repair and maintain its value as best as possible.[11]

The Barbes are either insureds under the Policy or are third-party beneficiaries of the Policy.[12] Ocwen had the right to either procure insurance for itself (mortgage protection) or for the benefit of the Barbes.[13]  Ocwen secured an insurance policy that benefited the Barbes by purchasing the Policy in excess of its own interest in the Mortgage.[14]  The Barbes' benefit under the Policy is not merely an incident of the contract, because any proceeds in excess of Ocwen's interest in the Mortgage must be paid to the Barbes—such is a direct and not simply an incidental benefit.[15]  Ocwen indicated its intent to benefit the Barbes by sending them a correspondence indicating that the Policy was procured "for you" [the Barbes].[16]

---

[8] Master Insurance Policy, R. Doc. 22, Exhibit 3, p. 1.
[9] R. Doc. 22, Exhibit 2, p. 1; R. Doc. 33, Exhibit 1, p. 5.
[10] R. Doc. 22, Exhibit 3, p. 4.
[11] R. Doc. 22, Exhibit 2, p. 5.
[12] R. Doc. 22, ¶¶16-17.
[13] R. Doc. 22, Exhibit 2, p. 5.
[14] R. Doc. 22, Exhibit 2, p. 5 (The Policy provides $260,064 in coverage for the Dwelling/Building and $26,006 in coverage for Other Structures); R. Doc. 22, Exhibit 1, p. 1 (The Mortgage provided Ocwen with a $211,500.00 interest in the Property/Policy).
[15] R. Doc. 22, ¶20.
[16] R. Doc. 22, Exhibit 2, p. 1("Enclosed is a policy that renews *your* lender-placed insurance policy"), ("We have ***issued this policy for you*** because we did not receive proof that you have obtained insurance").

3.

**B.**      ***The Barbes' Property Insurance Claim***

Following the storm described hereinabove, the Barbes contacted AMHIC directly and made a claim for their damages, Claim No. 289365AA.[17]  At all relevant times, AMHIC negotiated the claim and adjusted the loss with the Barbes directly.[18]  AMHIC assigned an adjuster to the claim—which adjuster acted as mandatary for AMHIC and represented AMHIC regarding the claim by investigating, processing, evaluating, approving, and/or denying, in whole or in part, the claim.[19]  Plaintiffs provided AMHIC with "satisfactory proof of loss" and AMHIC was fully apprised of Plaintiffs' damages upon its first inspection of the Property.[20]

AMHIC's adjuster created an underpriced and under-scoped estimate, totaling $11,895.48 (ACV) / $12,360.56 (RCV)—a fraction of what it would cost to bring the Property back to its pre-storm condition.[21]  After Plaintiffs complained about the lack of insurance proceeds, AMHIC re-inspected the Property weeks later, again creating an underpriced and under-scoped estimate of damages, totaling $7,303.08 (ACV) / $8,475.59 (RCV).[22]  The estimates of AMHIC's adjuster(s) were grossly inadequate.[23]  Additional necessary repairs would cost Plaintiffs in excess of $139,191.25.[24]  AMHIC's adjuster(s) failed to properly evaluate the Barbes' claim, failed to spend an adequate amount of time at the Property, and willfully ignored an abundance of damage to the Property.[25]

---

[17] R. Doc 22, ¶25.
[18] AMHIC Letter to Marc Barbe, dated 2/28/18, R, Doc. 22, Exhibit 4.
[19] R. Doc 22, ¶27.
[20] R. Doc 22, ¶28.
[21] R. Doc 22, ¶30.
[22] R. Doc 22, ¶31.
[23] R. Doc 22, ¶32.
[24] R. Doc 22, ¶33.
[25] R. Doc 22, ¶34.

At all relevant times, AMHIC communicated with the Barbes as the proper party to the Claim.[26]  The Barbes made the claim directly to AMHIC; the Barbes attended all inspections and dealt directly with AMHIC adjuster(s) and representative(s), and the Barbes communicated directly with AMHIC regarding the claim and AMHIC's claims handling.[27]  The Barbes, believing AMHIC and its mandatary(ies) would deal in good faith, reasonably relied on the misrepresentations made by AMHIC and/or its mandatary(ies).[28]  This reliance was to the Barbes' detriment, as the Property was rife with damages and experiences continuing damages, even today; because the Barbes have not been able to affect proper repairs to the Property—due to a lack of insurance proceeds—the Property continues to incur damages from, *inter alia*, exposure, and is in an even more deleterious state than it was when AMHIC first inspected it.[29]  This fact is admitted by AMHIC, who, in an August 8, 2018 letter to Ocwen, stated: "our re-inspection of the property shows… the damages including mold have worsened."[30]

AMHIC was arbitrary, capricious, and lacking probable cause when it knowingly or negligently refused to adjust the Barbes' claims in good faith, and within thirty days of receiving satisfactory proof of loss.[31]  AMHIC has yet to make full and proper payment on the Barbes' claims to date.[32]  AMHIC failed to properly investigate and adjust the Barbes' claims in accordance with the Policy or in accordance with the law.[33]  AMHIC adjusted the Barbes' claim in an arbitrary and capricious manner.[34]

---

[26] R. Doc. 22, Exhibit 4.
[27] *Id.*
[28] R. Doc 22, ¶40.
[29] R. Doc 22, ¶41.
[30] AMHIC letter to Ocwen, dated 08/08/2018, R. Doc 22, Exhibit 5.
[31] R. Doc 22, ¶43.
[32] R. Doc 22, ¶44.
[33] R. Doc 22, ¶¶45-46
[34] R. Doc 22, ¶47.

C.      *Ocwen's Acts and Omissions Regarding its Obligations to the Barbes*

Ocwen, an insured under the Policy, failed to independently pursue or assist the Barbes in their pursuit of insurance proceeds from AMHIC, which were needed to make full and proper repairs to the Property—contrary to Ocwen's own interests in maintaining its security therein.[35]   The Mortgage Agreement provides: "In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.   Lender may make proof of loss if not made promptly by the Borrower."[36]   The Barbes, not Ocwen, initiated the claim with AMHIC, and triggered Ocwen's duty to follow through on the claim.[37]   Ocwen assumed the duty to pursue the Barbes' claim, as it was allowed to do under the Mortgage, and thus to handle the Barbes' claim—though the Barbes were at all times insureds or, at the very least, third-party beneficiaries under the Policy.[38]

Ocwen breached the Mortgage, as well as the duty of good faith and fair dealing, by overcharging the Barbes "for the Policy," while, on information and belief, hiding kickbacks and other forms of payments from AMHIC that reduced the price of that Policy to Ocwen, while maintaining the inflated cost to the Barbes.[39]   The Barbes sustained original and consequential damages and have been unable to properly repair their home as a result of Ocwen's bad acts.[40]

D.      *AMHIC's and Ocwen's Conspiracy*

Upon information and belief, Ocwen was involved in a relationship with AMHIC such that AMHIC billed Ocwen an inflated amount for the force-placed Policy, and Ocwen passed along that inflated premium to the Barbes.[41]   Upon information and belief, and unknown to the Barbes, AMHIC

---

[35] R. Doc 22, ¶49.
[36] R. Doc. 22, Exhibit 2, p. 5.
[37] R. Doc 22, ¶51.
[38] R. Doc 22, ¶52.
[39] R. Doc 22, ¶¶53-54.
[40] R. Doc 22, ¶56.
[41] R. Doc 22, ¶57.

provided Ocwen with unearned "kickbacks" by making direct payments to Ocwen, by providing Ocwen with a percentage of the premium charged to the Barbes, by subsidizing or discounting administrative services charged to Ocwen, by entering into captive reinsurance deals with Ocwen, and/or by other means.[42]  This relationship is evidenced by the Barbes' hyper-inflated premium under the Policy and allegations made against Ocwen by other persons/entities nationwide.[43]  Ocwen had no right to insure the Property for a value greater than the value of the "improvements now existing or hereafter erected on the property."[44]  Upon information and belief, this relationship was for the benefit of Ocwen and AMHIC and to the detriment of the Barbes and amounts to civil law conspiracy.[45]

## III.  LAW AND ARGUMENT

Plaintiffs' claim should not be dismissed as asserted by Ocwen.  The Barbes have demonstrated that: (1) the filed rate doctrine is inapplicable under the facts of this case; (2) Ocwen breached the underlying mortgage agreement, both by conspiring to and/or actually over-charging the Barbes for a force-placed insurance policy and by failing to pursue adequate insurance proceeds against AMHIC in the wake of the Barbes' claim; (3) the Barbes have standing to bring their claim against Ocwen for its breach of the duty of good faith and fair dealing; (4) Ocwen and AMHIC were engaged in a conspiracy to defraud the Barbes; and (5) the Barbes delictual actions were not prescribed, as the doctrine of *contra non valentem* acted to toll the running of prescription.  As such, Ocwen's Motion to Dismiss should be denied.

---

[42] R. Doc. 22, Exhibit 2, p. 5.
[43] R. Doc. 22, Exhibit 1, p. 1 (R. Doc. 12-5, p. 1) ("The renewal policy's annual premium will be $3,927.00…"); see also *Lee v. Ocwen Loan Servicing, LLC*, 14-cv-60649, 2015 U.S. Dist. LEXIS 121998 (S.D. Fla. Sep. 14, 2015), and its associated pleadings.
[44] R. Doc. 22, Exhibit 2, p. 5.
[45] R. Doc 22, ¶¶53-54.

**A.**   ***Legal Standard for Motions Made Pursuant to Rule 12(b)(6), Fed. R. Civ. Proc.***

The purpose of a Rule 12(b)(6) motion to dismiss is to allow a defendant, *i.e.* Ocwen, to test whether, as a matter of law, the plaintiffs, *i.e.* the Barbes, are entitled to legal relief, even if everything alleged in the complaint is true.  *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir. Mich. 1993).  Put another way, "the purpose of a motion under Federal Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *5B Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure* § 1356 (3d ed. 2004).

The test for dismissal under *Fed. R. Civ. Proc.* R 12(b)(6) is a stringent one.  "[A] complaint should not be dismissed for failure to state a claim on which relief can be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hartford Fire Ins. Co. v. Cal.,* 509 U.S. 764, 811 (U.S. 1993) (citing *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246, 62 L. Ed. 2d 441, 100 S. Ct. 502 (1980) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))).  In addition, for purposes of the motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff and its allegations must be taken as true.  *Scheuer v. Rhodes,* 416 U.S. 232 (U.S. 1974).  As the Fifth Circuit has stated, Rule 12(b)(6) motions "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009), citing *Test Masters Educ. Servs. Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is sufficient when it allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  The general rule

is that a court may consider only those factual allegations within the "four corners" of the complaint. *Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011).  However, the Fifth Circuit, in *Collins v. Morgan Stanley Dean Witter*, crafted three exceptions to the "four corners" rule.  224 F.3d 496, 503 (5th Cir. 2000).  In the context of a Rule 12(b)(6) motion, a court may consider extrinsic documentary evidence if: (1) the document is attached to a defendant's motion to dismiss; (2) the document is referred to in the plaintiff's complaint; and (3) the document is "central" to the plaintiff's claims.  *Id* at 498-99.  As demonstrated below, Plaintiffs make sufficient claims under Louisiana State Law to survive Ocwen's Rule 12(b)(6) Motion to Dismiss.

**B.      *The Filed Rate Doctrine is inapplicable***

Ocwen asserts that the filed rate doctrine bars the Barbes from challenging "the reasonableness of the rates for hazard insurance that have been approved by the Louisiana Department of Insurance."  However, and for the reasons set out below, this assertion is untrue and beside the point.

Ocwen quotes the Texas case, *Winn v. Alamo Title Ins. Co.*, for the notion that: "[T]he filed rate doctrine forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate regulatory authority" and that the filed rate doctrine "bar[s] judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair, or unlawful."  No. A-09-CA-214-SS, 2009 WL 7099484, at * 3. However, neither Ocwen nor AMHIC provide any evidence that the rate charged to the Barbes was filed with the proper regulatory authority—the Louisiana Department of Insurance.

Furthermore, neither Ocwen nor AMHIC provide any Louisiana applications of the filed rate doctrine.  There is good reason for this failure, as the filed rate doctrine was arguably rejected by the Louisiana Supreme Court over one-hundred years ago. *Tex. & P. R. Co. v. R.R. Com. of*

*La.*, 69 So. 837 (1915) ("Nor are we able to see in what way the particular rulings of the United States courts… relating to the jurisdiction of the [rate setting commission], can affect the issue presented in this case, since those rulings are predicated upon an act of Congress which confers upon that Commission judicial powers and a certain jurisdiction, concurrent with that of the Circuit and District Courts of the United States").  Furthermore, and to the extent the Louisiana Supreme Court has considered the filed rate doctrine since ruling in *Tex. & P. R. Co.*, it has found that "[t]he filed-rate doctrine does not preclude a party from challenging a utility's misapplication of its tariff."  *Daily Advertiser v. Trans-La, Div. of Atmos Energy Corp.*, 612 So.2d 7, 21 (La. 1993) (the "doctrine does not preclude plaintiff-customers from challenging defendants' alleged manipulation of automatic fuel adjustment clauses").  Just as the plaintiffs in *Daily Advertiser*, the Barbes have the right to challenge the rate charged to them for the Policy by AMHIC/Ocwen—which rate was manipulated to ensure that the Barbes paid more for the insurance than did Ocwen. The Barbes have made sufficient allegations that AMHIC/Ocwen manipulated the prices charged for the force-placed insurance policy.  As such, Ocwen's Motion to Dismiss in this regard should be denied.

Additionally, and contrary to the litany of non-binding Mississippi and Texas case law cited by Ocwen to demonstrate that the filed rate doctrine denies plaintiffs a cause of action for exorbitantly-priced force-place insurance policies, the Barbes allege more than AMHIC charged an unreasonably-high premium.  Here, the rate actually paid by Ocwen was, upon information and belief, lower than the rate paid by the Barbes—whether directly lower, or lower because of the kickbacks AMHIC provided to Ocwen.  Because of AMHIC and Ocwen's scheme, whether the rate charged by AMHIC to Ocwen was in accordance with the rates set by the Louisiana Department of Insurance is irrelevant—though neither AMHIC nor Ocwen have disclosed that

information—because the rate charged would not accurately reflect what Ocwen paid for the Policy.  For these reasons, the filed rate doctrine is inapplicable and Ocwen's Motion to Dismiss in this regard should be denied.

*C.*      ***Ocwen Breached the Mortgage Agreement***

In contravention to the terms of the Mortgage, Ocwen: (1) over-charged the Barbes for the Policy; and (2) failed to assist the Barbes with their pursuit or individually pursue claims against AMHIC for the recovery of insurance proceeds sufficient to repair the Property.  These breaches stem directly from Ocwen's relationship with AMHIC, as described *supra*.  Ocwen asserts that the Barbes do not cite the specific provision of the mortgage that has been breached.  This is incorrect.  The Barbes attach the Mortgage Agreement to their First Supplemental and Amended Complaint, thereby asserting the provision of the agreement be reference.

**1.      Ocwen Over-charged the Barbes for the Policy.**

The Mortgage sets forth:

**5.  Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance…

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense…  Borrower acknowledges that the *cost of coverage* might significantly exceed the cost of insurance that Borrower could have obtained.[46]

Under the preceding provisions, Ocwen had the right to obtain insurance coverage for the improvements on the Property.  However, and upon information and belief, the amount charged to Barbes included unearned kickbacks, reinsurance premiums, and/or discounted administrative servicing, and/or other impermissible costs.  These amounts are not *costs of coverage*, and Ocwen

---

[46] Exhibit 2, p. 5 (R. Doc. 12-3, p.5).

had no right under the Mortgage to charge the Barbes for these costs.  Furthermore, the Policy was excessive and unnecessary to protect Ocwen's interest.  The value of the Policy is substantially-greater than the value of Ocwen's interest in the mortgage—and even greater than the value of the Property itself.  Ocwen had no right to insure the Property for a value greater than the value of the "improvements now existing or hereafter erected on the property."[47]  As such, Ocwen's actions in over-charging the Barbes "for the Policy" amount to a breach of the Mortgage.  The Barbes further allege that their damages include the amount they were overcharged for the Policy, as well as their inability to make full repairs to their property.  As such, the Barbers have adequately alleged the breach of Ocwen and their resulting damages.

Ocwen's reliance on *Woodside v. Pacific Union Financial, LLC* for the notion that "it is not the lender's obligation to price shop for competitive insurance policies," is clearly irrelevant. No. 17-12191, 2018 WL 1419349, at *5 (E.D. La. Mar. 22, 2018).  It is not Ocwen's price shopping abilities that are in question.  Ocwen deliberately over-charged the Barbes under the guise of insurance, for unearned kickbacks, reinsurance premiums, and/or discounted administrative servicing, and/or other impermissible costs.

Rather than address its relationship with AMHIC, Ocwen argues that it did not "promise in the Mortgage" to procure insurance to protect the Barbes.  Aside from being irrelevant to charging the Barbes for unearned kickbacks, *etc.*—which the crux of their breach of contract argument regarding Ocwen overcharging for the Policy—it is extremely misleading, if not outright false.

Under the Policy, Ocwen had the right to either procure insurance for itself (mortgage protection) or for the benefit of the Barbes.[48]  Because the value of the Policy is substantially

---

[47] Exhibit 2, p. 5 (R. Doc. 12-3, p.5).
[48] Exhibit 2, p. 5 (R. Doc. 12-3, p. 5).

greater than the value of Ocwen's interest in the mortgage, it is clear that Ocwen chose the latter, and secured an insurance policy that benefited the Barbes.[49]   Furthermore, by sending correspondence to the Barbes indicating that the insurance was procured "for you" [the Barbes], Ocwen made clear its intention that the policy was made to benefit the Barbes.[50]  As such, whether or not Ocwen "promised" to procure insurance for the Barbes is irrelevant—Ocwen did, in fact, purchase insurance to protect the Barbes interest.

> **2.   Ocwen Failed to Pursue or Assist the Barbes in their Pursuit of Sufficient Insurance Proceeds from AMHIC**.

The Mortgage also provides: "In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by the Borrower."[51]  The Barbes contacted AMHIC to make a claim on the Policy.  According to Ocwen's argument, only Ocwen had sufficient privity with AMHIC to pursue a claim—an assertion the Barbes deny and the relevant documents refute.  However, if true, the Barbes' initiation of the claim triggered the duty of Ocwen to follow through on the claim, which it failed to do—resulting in great loss to the Barbes.

An assumption of duty arises when the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person.  *Bujol v. Entergy Services, Inc.*, 922 So.2d 1113, 1129 (La. 5/25/04).  Here, Ocwen undertook to

---

[49] R. Doc. 22, Exhibit 1, p. 5 (The Policy provides $260,064 in coverage for the Dwelling/Building and $26,006 in coverage for Other Structures);  Exhibit 2, p. 1 (R. Doc. 12-3, p. 1) (The Mortgage provided the mortgagee with a $211,500.00 interest in the Property).

[50] R. Doc. 22, Exhibit 1, p. 1. ("Enclosed is a policy that renews *your* lender-placed insurance policy"), ("We have **issued this policy for you** because we did not receive proof that you have obtained insurance").  It should be noted that nowhere in this correspondence does Ocwen state that the insurance policy is strictly for the benefit of the mortgagee.  To the contrary, the correspondence says the insurance is procured "for you;" it states the policy "may provide benefits for you;" and it states that the policy insures the property to the value of the property, as reflected on the most recent policy—and not solely to Ocwen's interest in the Policy.

[51] Exhibit 2, p. 5 (R. Doc. 12-3, p. 5).

submit satisfactory proof of loss to AMHIC as it was allowed to do under the Mortgage and thus to handle the Barbes claim, though the Barbes are insureds or at the very least third-party beneficiaries under the Policy.[52]  Because Ocwen assumed this duty, it was liable to do it correctly.

In *Crane v. Exxon Corporation, U.S.A.*, 613 So.2d 214, 221 (La. App. 1 Cir. 1992), *writs granted in part on other grounds and remanded*, 620 So.2d 858 (La. 1993), Exxon contracted with Merit for labor to be performed at a Baton Rouge refinery.  Although Merit was responsible for maintaining a safe work environment according to the contract, Exxon maintained the right to inspect the job site.  *Id*.  An Exxon employee regularly performed these inspections and reprimanded Merit for safety violations.  *Id*.  Therefore, the Court found that Exxon voluntarily assumed the task of monitoring the jobsite for violations of Exxon safety standards and, having assumed the responsibility, Exxon had a duty to perform it in a reasonable and prudent manner.  *Id*.  In other words, where a defendant voluntarily undertakes a task that he has no duty to perform, he must perform that task in a reasonable and prudent manner for the plaintiff's protection.

The same reasoning applies here.  While Ocwen did not have the duty—only the option—under the Policy to submit satisfactory proof of loss to AMHIC, once Ocwen assumed the role as claimant, it assumed the duty to carry out that role in a reasonable and prudent manner.  A reasonably prudent claimant, in the event of covered damages to his/her property, would pursue insurance proceeds sufficient to repair that property to its pre-damaged state.  Because Ocwen failed to pursue such insurance proceeds from AMHIC it breached the Mortgage.

---

[52] Please see the full arguments regarding the Barbes' status as insureds or, at the very least, third-party beneficiaries in their Memorandum in Opposition to the AMHIC's Motion to Dismiss which are adopted herein by reference.

### D.    *Ocwen Breached the Duty of Good Faith and Fair Dealing*

Ocwen asserts that, because the Barbes have not demonstrated a breach of contract, they cannot demonstrate a breach of the implied covenant of good faith and fair dealing.  However, this argument relies entirely on the success of its previous arguments related to Ocwen's breaches of contract.  Ocwen's argument fails precisely because its previous arguments fail.  The Barbes have demonstrated that Ocwen breached the Mortgage by (1) charging them amounts in excess of any true policy value, and for unearned kickbacks, reinsurance premiums, and/or discounted administrative servicing, and/or other impermissible costs; and (2) by assuming the Barbes' role as claimants, yet failing to pursue or assist the Barbes in their pursuit of sufficient insurance proceeds from AMHIC.  As such, Ocwen's argument in this regard must fail.

Louisiana's Civil Code dictates that: "Good faith shall govern the conduct of the obligor and the oblige in whatever pertains to the obligation."  La. C.C. Art. 1759.  While the Civil Code does not define good faith, Louisiana courts do not distinguish between "bad faith" and "lack of good faith."  *Am. Bank & Tr. V. FDIC*, 1993 U.S. Dist. LEXIS 19546, at *7 (W.D. La. Sep. 16, 1993).  Bad faith is found when, *i.e.*, an obligor intentionally and maliciously fails to perform his obligation."  La. C.C. Art. 1997, Comment (b).

Here, Ocwen intentionally and maliciously over-charged the Barbes "for the Policy," while hiding kickbacks and other forms of payments from AMHIC which reduced the price of that Policy to Ocwen, and failed to pursue the Barbes' claim against AMHIC—which failure to was apparently to the detriment of Ocwen's interest in the Property—in order to preserve the relationship between Ocwen and AMHIC.  This is quintessential bad faith.  Ocwen is liable to the Barbes for breaching the duty of good faith and fair dealing.

**E.      The Barbes have Adequately Pleaded the Negligence of Ocwen**

Ocwen argues a sole point in defense of its overcharging the Barbes "for the Policy" (to profit at the Barbes expense), and that is the notion that it only owed the Barbes those duties that arose out of the Mortgage.  To support its argument, Ocwen cites *Ochoa v. Proctor Fin. Ins. Co.* for the notion that "the only duty a financial institution owes a borrower is the duty to comply with the contract between the institution and the borrower."  2007 U.S. Dist. LEXIS 73635, at *9 (E.D. La. Oct. 2, 2007).  However, the *Ochoa* court was only concerned with fiduciary duties, not general duties.  *Id*.  Furthermore, the *Ochoa* court merely adopted its argument from *Landreneau v. Fleet Financial Group*, 197 F. Supp. 2d 551 (M.D. La. 2002) (holding that credit card company did not owe fiduciary duties to its customers).  A review of that case shows that it has since been distinguished on the very grounds considered here.

> Wells Fargo cites *Landreneau v. Fleet Financial Group*, 197 F.Supp.2d 551 (M.D. La. 2002) for the proposition that "a financial institution only owes to a borrower the duty of complying with the contract between the institution and the borrower." 197 F.Supp.2d at 557.  That case, however, centered its discussion solely on fiduciary duties, which are not the subject of this litigation, as the Court has already noted.  It is clear from the context of the quoted language that *Landreneau* did not express an opinion on whether banks could undertake other general duties based on their interactions with potential clients, and thus it does not provide authority for the position Wells Fargo takes.

*Bluebonnet Hotel Ventures, L.L.C. v. Wachovia Bank, N.A.*, 2011 U.S. Dist. LEXIS 158525, at *27 (M.D. La. Sep. 28, 2011).

As such, Ocwen could, and did, have duties not described in the Mortgage, including the duty to not overcharge the Barbes for the Policy, and the duty to not engage in a conspiracy with AMHIC to overcharge the Barbes for the Policy.

Furthermore, the Mortgage itself provides duties which were breached by Ocwen, as stated in the "Ocwen Breached the Mortgage Agreement" section, *supra*.  For those reasons previously

provided, the Barbes have demonstrated that Ocwen had the right to obtain and charge the Barbes for insurance coverage, but Ocwen breached that duty by charging the Barbes for things other than the cost of coverage, including unearned kickbacks, reinsurance premiums, and/or discounted administrative servicing, and/or other impermissible costs.  Additionally, and for those reasons previously provided, the Barbes have demonstrated that Ocwen had the right to submit proof of loss to AMHIC—and assume the Barbes' role as claimants—but breached that duty by failing to pursue adequate insurance proceeds from AMHIC.

Given the foregoing, the Barbes have adequately pleaded a negligence cause of action against Ocwen.  The Barbes allege that Ocwen owed a general duty to them not to overcharge for force-placed insurance.  The Barbes allege that Ocwen breached that duty by conspiring with AMHIC to overcharge the Barbes for the force-placed insurance and benefitting, each of them, from this overcharge. The Barbes allege that this overcharge for force-placed insurance caused them foreseeable damages, and the conduct of Ocwen and AMHIC was a cause-in-fact of the Barbes' damages resulting from this conduct.   The Barbes have thus met their pleading requirements for a viable negligence claim.   As such, Ocwen's Motion to Dismiss should be denied.

**F.**     ***Ocwen and AMHIC Allegedly Engaged in a Conspiracy to Defraud Borrowers***

In their First Supplemental and Amended Complaint under the section "AMHIC's and Ocwen's Conspiracy," the Barbes alleged that Ocwen coordinated efforts with AMHIC "to overcharge Plaintiffs for their insurance policy" and to "profit at the Plaintiffs' expense" which coordinated efforts "financially-damaged" the Barbes.[53]  For a conspiracy to exist, it need only be shown that "an agreement existed to commit an illegal or tortious act, which act was actually

---

[53] R. Doc. 22, ¶¶57-62.

committed, which resulted in the plaintiff's injury, and there was an agreement as to the intended

outcome or result." *Owens v. Byerly*, 23 So.3d 393, 398 (La. App. 3 Cir. 10/7/09), *writ denied* 31

So.3d 1063 (La. 4/16/10).   The Barbes have adequately plead each of these elements.   The

underlying tort is the coordinated effort to overcharge the Barbes for their force-placed insurance

policy.[54]   Ocwen makes much of the fact that the Barbes refer to the agreement between Ocwen and

AMHIC as a "relationship"; however, the well-pleaded facts indicate that Ocwen and AMHIC entered into

a pre-meditated agreement to allegedly deprive the Barbes of insurance premium dollars by overcharging,

then kicking-back—to their mutual benefit—the surplus premium dollars.[55]

The Barbes need not plead conspiracy with particularity, as described in *Curole v.*

*Delcambre,* 224 So.3d 1074, 1081-82 (La. App. 3 Cir. 08/02/17):

> The record establishes the trial court, mid-trial while counsel for the Curoles was
> questioning Bonnie Delcambe, sustained the defendant's objection to any further
> questioning of her and any other witnesses regarding the alleged conspiracy
> between the defendants.   The trial court's ruling was based on the erroneous
> conclusion that the Curoles failed to plead conspiracy with particularity.   This error
> hampered the Curoles' ability to present additional evidence on the elements of
> conspiracy.

The facts in *Curole* mirror those here.   And again, the Barbes have adequately-pleaded Ocwen's

negligence.   Furthermore, Ocwen's failure to disclose the nature of its relationship with AMHIC

to the Barbes is in direct furtherance of the conspiracy—for to disclose the true nature of that

relationship would be its undoing.

**G.       *The Barbes' Claims have Not Prescribed***

Ocwen asserts that the Barbes' delictual actions have prescribed because La. C.C.P. Art.

3492 provides that delictual actions have a one-year prescriptive period, and Ocwen negligence

related to the "overcharging of Plaintiffs for their lender-placed insurance policy" prescribed one

---

[54] R. Doc. 22, ¶57.
[55] R. Doc. 22, ¶¶58-61.

year after the Barbes' were made aware of those charges in a letter dated December 31, 2015.[56]

This assertion is false.  The December 31, 2015 put the Barbes on notice of the amount of the

premium, but not of the Policy's actual cost—because that letter did not describe the nature or

amount of kickbacks, *etc*. provided to Ocwen by AMHIC, effectively altering the cost of the

Policy.  This misrepresentation notwithstanding, the prescriptive period associated with the

Barbes' delictual actions was tolled by the doctrine of *contra non valentem*.

Delictual actions are subject to a liberative prescription of one year, commencing the day

injury or damage is sustained.  La. C.C. Art. 3492.  Prescription is not favored and must be strictly

construed against and in favor of the claim sought to be extinguished.  *Bailey. v. Khoury*, 891 So.

2d 1268, 1275 (La. 01/20/05).  The burden of proof lies with the party asserting prescription.  *Id*.

The Louisiana Supreme Court has recognized four factual situations in which *contra non*

*valentem* prevents the running of liberate prescription:

> (1) where there was some legal cause which prevented the courts or their officers
> from taking cognizance of or acting on the plaintiff's action;
>
> (2) where there was some condition coupled with the contract or connected with
> the proceedings which prevented the creditor from suing or acting;
>
> (3) where the debtor himself has done some act effectually to prevent the creditor
> from availing himself of his cause of action; or
>
> (4) where the cause of action is neither known nor reasonably knowable by the
> plaintiff even though plaintiff's ignorance is no induced by the defendant.

*Marin v. Exxon Mobil Corp.*, 48 So.3d 234, 245 (La. 10/19/10).

Particularly relevant here is the third situation, "where the debtor himself has done some

act effectually to prevent the creditor from availing himself of his cause of action."  Ocwen

---

[56] Although the Barbes address Ocwen's argument as it is drafted, it should be pointed out that the real issue
is not necessarily or exclusively the price of premiums "charged to Ocwen," but the comparison of the price
charged to the Barbes by Ocwen as related to the price charged to Ocwen by AMHIC, taking into
consideration any and all discounts, kickbacks, *etc*. provided to Ocwen by AMHIC.

conspired with AMHIC to prevent the Barbes from pursuing their causes of action against either or both of them.  AMHIC and Ocwen were in regular contact with the Barbes and continued to send adjusters to inspect and "adjust" the Barbes damages after its initial inspection of the Property—which resulted in woefully inadequate estimates.

The Louisiana Supreme Court, in *Plaquemines Parish Com. Council v. Delta Dev. Co.*, found that:

> Focusing particularly on Batson's third situation, prevention by the debtor, the cases exemplify this difference.  In *Nathan v. Carter*, 372 So.2d 560, where a defendant "ha[d] concealed… or ha[d] committed acts (including concealment, fraud, misrepresentation or other ill practices) which tend[ed] to hinder, impede or prevent the plaintiff from asserting his cause of action," the plaintiff's executive officer tort claim for wrongful death and the availability of timely suit were amply evident to her.  However, after noting the misrepresentation, we held contra non valentem was applicable because the foregoing acts constituted "acts of fraud and misrepresentation intentionally committed by defendants (or their representative) designed to hinder, impede or prevent plaintiffs from asserting their cause of action or lull them into a false sense of security."  *Nathan*, 372 So.2d at 563.

502 So. 2d 103, 1056-57 (La. 1987).

The reasoning in *Delta Dev. Co.* applies to the underlying tort allegations against Ocwen and AMHIC.  AMHIC and Ocwen, as described more fully hereinabove, entered into an agreement to overcharge the Barbes for insurance, then kick back excess premiums to their mutual benefits.  AMHIC and Ocwen also misrepresented to the Barbes the extent of their damages and misrepresented to them that it was adjusting their claim in good faith.  AMHIC's and Ocwen's misrepresentations hindered, impeded, or prevented the Barbes from asserting their causes of action, and/or lulled the Barbes into a false sense of security.  *Contra non valentem* is appropriate under these circumstances, as it was appropriate under similar circumstances in *Delta Dev. Co.*, *supra*.

It was not until August 8, 2018, and after the one year prescriptive period had run, that AMHIC sent Ocwen a letter stating "there is no additional coverage under your policy for the loss" and "your claim is respectfully denied for any new damages…"[57]  Though this letter was only later provided to the Barbes, it represents the definitive cutoff of AMHIC's adjustment of their claim. The Barbes filed suit less than a week before that letter was written, and after it became clear to the Barbes that AMHIC was not adjusting their claim in good faith.   Nevertheless, and as demonstrated by the August 8, 2018 letter, AMHIC put on the façade of adjusting the Barbes' claim, even after they filed the underlying petition.   Because AMHIC's and Ocwen's actions effectually prevented the Barbes from bringing their delictual actions sooner, the prescriptive period associated with those actions was tolled through the doctrine of *contra non valentem.*   As such, the Barbes' tort causes of action have not prescribed, and Ocwen's Motion to Dismiss in this regard should be denied.

**H.**      ***In the Alternative, the Barbes have Stated a Claim for Ocwen's Unjust Enrichment***

The Barbes stated a cause of action for Ocwen's unjust enrichment as follows:

Ocwen received funds from the Barbes by means of inflated insurance premiums related to the Policy, as well as kickbacks, commissions, captive reinsurance arrangements, and subsidized loan servicing from AMHIC.  Ocwen entered into an agreement with AMHIC such that AMHIC would provide the Policy to the Barbes, and Ocwen would charge the Barbes an artificially-inflated rate, to include costs not properly chargeable to the Barbes.  It was for this reason that the Policy was more expensive than those available in the open market.  The Policy provided coverage in excess of that required by law or the Mortgage, and in excess of Ocwen's interest in the Property. AMHIC paid and collected premiums, kickbacks, commissions, and reinsurance tied directly to

---

[57] R. Doc. 22, Exhibit 5.

the cost of the Policy, and AMHIC paid commissions and/or kickbacks directly to Ocwen, as a means of discounting the Ocwen's cost for the Policy.  AMHIC was a conduit for the delivery of kickbacks, commissions, and/or other charges to Ocwen pertaining to the Policy.  These payments directly benefitted Ocwen and damaged the Barbes, as the kickbacks, commissions, reinsurance and other subsidized costs were included in the price of the Policy and passed down to the Barbes—thus Ocwen had the incentive to charge the Barbes an unreasonably and artificially inflated amount for the Policy.  As a result, the Barbes have conferred a benefit on Ocwen.  Ocwen had knowledge of that benefit and accepted and retained the benefit conferred upon it.  Ocwen will be unjustly enriched if permitted to retain the benefits. The Barbes are entitled to recover the amount by which Ocwen was unjustly enriched at their expense.[58]

Ocwen argues that the Barbes do not have a breach of contract claim against Ocwen for over-charged premiums—that the Mortgage Agreement does not cover these allegations.  Ocwen further argues that the Barbes do not have a cause of action for breach of the duty of good faith and fair dealing, as the Barbes do not have an underlying claim for breach of contract.  Finally, Ocwen argues that the Barbes do not have a conspiracy cause of action because they do not have a valid underlying tort claim.  The Barbes deny Ocwen's allegations in this regard.  However, to the extent the Court finds these allegations valid, the Barbes do have a valid alternative claim for unjust enrichment.

The Barbes have adequately alleged an enrichment—Ocwen has been enriched by receiving the benefit of premium dollars over and above the cost of the force-placed policy being kicked back to it.  The Barbes have established an impoverishment—they were overcharged for the Policy.  The Barbes have established a causal relationship between Ocwen's enrichment and

---

[58] R. Doc. 22, ¶¶95-107.

their impoverishment—both the enrichment and the impoverishment were part of a scheme by which Ocwen was kicked back premium dollars.  The Barbes have established that no justification exists for the enrichment or the impoverishment—the enrichment and impoverishment was part of a scheme to overcharge premium dollars to the Barbes and enrich both Ocwen and AMHIC in the bargain.  The only issue that remains is whether a cause of action exists under which the Barbes can recover.  Of course, the Barbes assert that multiple causes of action exist under which they can recover, but Ocwen denies the existence of these causes of action.  Ocwen asserts that the Barbes have a breach of contract claim under the Mortgage Agreement, but denies that the Mortgage Agreement provides a cause of action for overcharging insurance premiums.  While the Barbes deny this allegation, they plead their right to a cause of action for unjust enrichment in the alternative.

### CONCLUSION

The Barbes have demonstrated that: (1) the filed rate doctrine is inapplicable under the facts of this case; (2) Ocwen breached the underlying mortgage agreement, both by conspiring to and/or actually over-charging the Barbes for a force-placed insurance policy and by failing to pursue adequate insurance proceeds against AMHIC in the wake of the Barbes' claim; (3) the Barbes have standing to bring their claim against Ocwen for its breach of the duty of good faith and fair dealing; (4) Ocwen and AMHIC were engaged in a conspiracy to defraud the Barbes; and (5) the Barbes delictual actions were not prescribed, as the doctrine of *contra non valentem* acted to toll the running of prescription.  As such, Ocwen's Motion to Dismiss should be denied.

**WHEREFORE,** Plaintiffs, Marc C. Barbe and Renada E. Barbe, respectfully pray that Ocwen Loan Servicing, LLC's 12(b)(6) Motion to Dismiss be denied, and for any other relief that this Honorable Court deems appropriate.

Respectfully submitted this 9th day of April, 2019.


BY:                                        **_s/David A. Binegar_**
                                           David A. Binegar (#26603)
                                           Tiffany R. Christian (#28529)
                                           BINEGAR CHRISTIAN, LLC
                                           4902 Canal Street, Suite 301
                                           New Orleans, Louisiana 70119
                                           Telephone:    504.301.1403
                                           Facsimile:    504.304.2081
                                           *Attorneys for Marc C. Barbe and*
                                           *Renada E. Barbe*